J-S05030-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN RE: P.G.F., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.F., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1464 WDA 2018 |

Appeal from the Order Entered September 27, 2018
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  No. 3 AD 2018

BEFORE: PANELLA, P.J., NICHOLS, J., and STRASSBURGER[*], J.

MEMORANDUM BY NICHOLS, J.:                    FILED MARCH 13, 2019

K.F. (Father) appeals the September 27, 2018 order granting the petition of T.G.H. (Mother) and E.N.H. (Husband) to terminate Father's parental rights to his minor son, P.G.F., born in July 2012 (Child).  Following careful review, we are constrained to vacate the order, and remand for further proceedings consistent with this memorandum.

Mother and Father, who never married, are the parents of Child, who was born in July 2012.  See N.T., 7/31/18, at 6-7.  At the time of Child's birth, Mother and Father were living with Mother's parents (Maternal Grandparents).  Id. at 7.  However, when Child was approximately a month-and-a-half or two

_____

[*] Retired Senior Judge assigned to the Superior Court.

months old, Mother and Father ended their romantic relationship, and Father moved out of the residence.  Id. at 7-8.

Mother and Child continued to reside with Maternal Grandparents until Maternal Grandparents ended their marriage.  Id. at 9-10.  Mother and Child moved with Maternal Grandmother among several residences in Bedford County.  Id. at 8-10.  In 2013, Mother filed a custody action against Father. Id. at 11.  In May 2014, Mother and Father entered into a custody agreement, where Father had physical custody every other weekend.  Id. at 12.  Father was able to exercise his custody rights for approximately eight months, when Child was approximately three years old.  Id. at 20.

In October 2017, Mother married Husband.  Id. at 5.  They began residing together immediately after marriage.  Id. at 8.  On February 27, 2018, Mother and Husband filed a petition seeking to involuntarily terminate Father's parental rights.  The court appointed Carole Rose, Esq., as guardian ad litem/legal counsel to represent Child.[1]

The court held evidentiary hearings on July 31, 2018, and September 11, 2018.  Mother, D.H. ("Paternal Grandmother"), Husband, and Father

_____

[1] See In re T.S., 192 A.3d 1080, 1092 (Pa. Super. 2018) (noting that where there is no conflict between a child's best and legal interests, a guardian ad litem may serve dual roles and still satisfy the child's statutory right to counsel in involuntary termination proceedings).

testified. Attorney Rose was present at the hearing and cross-examined the witnesses.

Mother testified that when she and Father first ended their relationship and up until the time that Child was approximately one year old, they attempted to co-parent. Id. at 10-11. Following the custody agreement in May 2014, Father exercised his custody rights for approximately eight months, or "a few" months into 2015. Id. at 17-23. However, visitation "slowed down," and Paternal Grandmother became more involved with Child and took Child when Father was to exercise his custody rights. Id. at 12-14. Mother claimed that, over the last five years, custody had always been shared between Mother and Paternal Grandmother, and Father had not picked up Child from Mother's custody in that time. Id. at 14.

Mother also claimed that Father had no contact with her, and never inquired about Child on birthdays or holidays, or when Child required surgery to remove his tonsils and adenoids when Child was three years old. Id. at 15-16. Mother texted Father and sent him Facebook messages about doctor's appointments but never received a response. Id. at 15-16, 46-47. Mother denied that Father or Paternal Grandmother sent Child birthday cards, Christmas cards, or gifts, although he did give gifts and cards to his other child. Id. at 29, 35. However, Mother received child support from Father. Id. at 27.

Mother admitted that Child sometimes stated that Father was at Paternal Grandmother's house. Id. at 26. However, she disagreed that Child had an overnight stay with Father in the last three years. Id. at 29-30. Mother denied that Child referred to Father as "dad." Id. at 26. According to Mother, Child refers to Husband as "dad," and to Father by his first name, or as "Grammy [Paternal Grandmother]'s friend." Id. at 29-31. Mother claimed that Child did not know Father was his biological father. Id. at 31. Mother disagreed that she hid her whereabouts from Father or blocked him on social media. Id. at 20-21, 34. However, on cross-examination, she admitted that she sent text messages stating that she did not want Father to be around Child, and that she did not want Child to be taken to Paternal Great-Grandmother's house. Id. at 55-62. Mother stated that if Father had contacted her at the end of 2015 regarding his court-ordered custody periods, she probably would have said "yes," but as time passed without his visits, she would have said "no". Id. at 63-64.

Mother testified that she wishes for Husband to be able to adopt Child, because he performs fatherly duties for Child, and because Mother and Husband are expecting a child of their own. Id. at 39-40. Mother stated she would not prevent Paternal Grandmother from seeing Child if Father's parental rights were terminated. Id. at 43-44.

Paternal Grandmother testified that Father has seen Child "even more than what [Mother] has said or maybe even realized." See N.T., 9/11/18, at

7.   Paternal Grandmother indicated she does not refer to Father as such in front of Child, and instead calls Father by his first name to avoid confusing Child.  Id. at 8.  Although Father is often around when Paternal Grandmother has custody of Child, when Mother told Paternal Grandmother that she was not allowed to have Father around Child, she obeyed.  Id. at 10.  Paternal Grandmother believed that Mother made it difficult for Father to be in Child's life and this was about the time that his relationship with Child changed.  Id. at 13, 32.  At first, Father was there "one hundred percent" but that eventually "it just seemed like it was easier for him not to fight and argue to get [Child]." Id. at 14.  Paternal Grandmother also admitted that Father had not had a father-son relationship with Child for the last two years.  Id. at 22.  However, she attributed this to the "strain" with Mother and noted that Father was a good father to his other child.  Id. at 38.  Paternal Grandmother denied that she took Child because Father was not caring for Child appropriately.  Id. at 46-47.

Husband testified that his relationship with Child is "really good," and that he tries to not be involved in any issues involving Mother, Father, and Child.  Id. at 53-54.  Husband stated that Child calls him "dad," and respects him as a paternal figure.  Id. at 55-56.  Child has never brought up Father to Husband.  Id. at 55.  In cross-examining Husband, Attorney Rose noted she had spoken with Child:

> [Attorney Rose]. So, when I spoke with [Child,] I asked him who
> he lived with and he named mom, and he must have named your

- 5 -

parents['] names and your brothers, but I had to ask him several times to get him to say it. He said, [Husband's nickname].

[Husband]. Yeah. Could be it.

[Attorney Rose]. And I said, I'm sorry, I had to ask him a couple times to repeat that. He was very specific he lived with his mom and [Husband's nickname]. I had to look at the petition for your name and he said yes. But he never referred to you as dad. Does that surprise you?

[Husband]. Not necessarily.

Id. at 61. Husband explained that Child, in addition to "dad," occasionally calls Husband by his nickname. Id. at 61.

Father testified that he has two children: Child and a younger daughter. Id. at 64-65. Although he has no custody order for his daughter, he has had no issues sharing custody with his daughter's mother. Id. at 65. Father testified, that, at the time of Child's birth, he and Mother were both working full time, and maternal and paternal grandparents helped care for Child. Id. at 68. When Father was home, he cared for Child, including changing his diaper. Id. at 68. After Father and Mother separated, Father had partial custody of Child at his home every other weekend, and one overnight during the week. Id. at 68-69. At some point, Paternal Grandmother began taking custody of Child; Father claimed this was because his daughter's mother and Mother did not get along. Id. at 72-73. Father then "stopped trying" because he was "tired of the games." Id. at 74-75. Father also noted that about a year prior to the termination hearing, Mother had asked him to voluntarily relinquish his parental rights. Id. at 100.

With respect to his interactions with Child, Father described Child as not talkative, and that Father did not want to "push" himself onto Child or scare him away. Id. at 80. Father stated that although Child calls Father by his first name, Child did "not always" do so. Id. at 94. Father testified that he was present for several of Child's birthdays, including Child's fourth, and Christmas in 2017. Id. at 82-83. Father denied taking inappropriate care of Child, in response to Mother's averments that Father had failed to change Child's diapers. Id. at 83-84. Father stated he could not attend Child's tonsil surgeries because he had to work. Id. at 85. Father acknowledged that the garage where he works is very close to Paternal Grandmother's residence, and he would often walk to the house to see Child. Id. at 95. As noted above, Attorney Rose cross-examined the witnesses, but she did not state Child's preferred outcome. We acknowledge that Attorney Rose argued for the Child's best interests, id. at 104-05, but did not articulate Child's preferences.

On September 27, 2018, the court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). Father timely filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issue for our review:

> Whether the trial court erred/abused its discretion in determining [Mother] had established a legal basis through clear and convincing evidence for terminating Appellant's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), as the [c]ourt failed to give appropriate weight to the natural mother's efforts to thwart

the father-son relationship, and as such the [c]ourt's finding is not supported by the record?

See Father's Brief at 5 (suggested answer omitted).[2]

We review cases involving the termination of parental rights according to the following standards.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Upon review of the record and prior to addressing the merits of Father's appeal, we must first address sua sponte the representation provided by Child's legal counsel. See In re K.J.H., 180 A.3d 411, 413-14 (Pa. Super. 2018). Our Supreme Court, in In re Adoption of L.B.M., 161 A.3d 172, 183-84 (Pa. 2017) (plurality), held that 23 Pa.C.S. § 2313(a) requires that

---

[2] Attorney Rose's appellate brief for Child did not state Child's preferred outcome. The guardian ad litem argued that the record established that Father had abandoned his parental duties and faulted Mother and Paternal Grandmother for their selfish conduct, which led to the termination of Father's parental rights. Child's Brief at 12.

counsel be appointed to represent the legal interests of any child involved in contested involuntary termination proceedings. The L.B.M. Court noted that a child's legal interests "are synonymous with the child's preferred outcome," but the child's best interests are determined by the trial court. Id. at 174. Since L.B.M., this Court has clarified the requirements counsel must meet in order to provide adequate representation in termination matters. See In re Adoption of T.M.L.M., 184 A.3d 585, 590 (Pa. Super. 2018) (holding that counsel must, "at a bare minimum, attempt[] to ascertain the client's position and advocat[e] in a manner designed to effectuate that position"). The Pennsylvania Supreme Court has held that a guardian ad litem may serve as legal counsel when there is no conflict between the child's legal and best interests. See In re T.S., 192 A.3d 1080, 1092-93 (Pa. 2018). The absence of a conflict necessarily presupposes knowledge of the child's preferred outcome, unless that child is incapable of expressing that outcome. See id.

Here, as noted above, the trial court appointed Attorney Rose as the guardian ad litem/legal counsel for Child. See, e.g., K.M., 53 A.3d at 781; In re T.S., 192 A.3d at 1092-93. Attorney Rose was present at the hearing and cross-examined the witnesses. Although Attorney Rose met with Child, see N.T. at 61, she did not argue Child's preferred outcome or that Child, although six years old at the time of the hearing, was unable to express his preferred outcome. See id. at 104-05. Additionally, Attorney Rose did not explicitly articulate Child's legal preferences in the appellate brief. Rather,

Attorney Rose noted that the Child's best interests were advanced by terminating Father's parental rights because Father's actions did not constitute performance of parental duties, but nonetheless criticized Mother and Paternal Grandmother for their selfish behavior. See Child's Brief at 9-12.

Accordingly, we are constrained to vacate the order and remand for further proceedings. See T.M.L.M., 184 A.3d at 589-91 (vacating and remanding for further proceedings where the attorney admitted she did not interview the six-year-old child to ascertain the child's preferences); see also In re Adoption of M.D.Q., 192 A.3d 1201, 1206 (Pa. Super. 2018) (vacating and remanding where the record does not indicate that counsel attempted to ascertain the children's preferences and the record does not reflect the children's legal interests); cf. In re Adoption of D.M.C., 192 A.3d 1207, 1212-13 (Pa. Super. 2018) (vacating and remanding where the record was unclear in what capacity attorney had been appointed to represent children, including four-and-a-half-year-old child, and whether attorney had ascertained children's legal interests prior to hearing).

On remand, we direct the orphans' court to re-appoint legal counsel for Child forthwith. Counsel must attempt to ascertain Child's preferred outcome as to Father by directly interviewing him, following any direction to the extent possible, and advocating in a manner that comports with Child's legal interests. Once Child's preferred outcome is identified, counsel shall notify

the orphans' court whether termination of Father's parental rights is consistent with Child's legal interests. If Child's preferred outcome is consistent with the result of the prior termination proceedings, the orphans' court shall re-enter its September 11, 2018, termination order as to Father. If the preferred outcome is in conflict with the prior proceeding, the orphans' court shall conduct a new termination/goal change hearing as to Father to provide Child's legal counsel an opportunity to advocate on behalf of Child's legal interests. See T.M.L.M., 184 A.3d at 591 (ordering that orphans' court shall conduct a new hearing only if it serves the "substantive purpose" of providing the child with the opportunity to advance his legal interests through new counsel).

Order vacated without prejudice to permit the orphans' court to re-enter the original order if a new termination hearing is not required. If the original order is re-entered, the orphans' court is ordered to file an opinion that complies with Pa.R.A.P. 1925(a)(2)(ii), including findings of fact and conclusions of law in support of termination. The orphans' court order does not comply with Rule 1925(a)(2)(ii). Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/13/2019

- 11 -